UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

REBECCA D. JULIAN,

       Plaintiff,

v.                                          Case No. 6:21-cv-1446-MAP

COMMISSIONER OF SOCIAL SECURITY

       Defendant.

_____/

## **ORDER**

Plaintiff seeks judicial review of the denial of her claim for a period of disability and disability insurance benefits (DIB). Plaintiff argues that the Administrative Law Judge (ALJ) committed reversible error by failing to adequately evaluate the persuasiveness of the medical source opinions using the five factors set forth in the new regulations and failing to provide substantial evidence in support of the residual functional capacity (RFC) assessment. As the ALJ's decision was based on substantial evidence and employed proper legal standards, the Commissioner's decision is affirmed.

    *I.*    *Background*

Plaintiff, who was born in 1978, claimed disability beginning May 3, 2019 (Tr. 166). Plaintiff was 41 years old on the alleged onset date (Tr. 30). Plaintiff obtained at least a high school education, and her past relevant work experience included work as a license clerk, a receptionist at a doctor's office, a billing clerk, and a manager at a

liquor establishment (Tr. 44, 65, 191).  Plaintiff alleged disability due to lower back pain, anxiety, depression, restless leg syndrome (RLS), being overweight, and sharp, shooting pain moving up her legs from her heels (Tr. 190).

Given her alleged disability, Plaintiff filed an application for DIB (Tr. 166-69). The Social Security Administration (SSA) denied Plaintiff's claims both initially and upon reconsideration (Tr. 74-103, 106-22).  Plaintiff then requested an administrative hearing (Tr. 123-24).  Per Plaintiff's request, the ALJ held a telephonic hearing at which Plaintiff appeared and testified (Tr. 35-73).  Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 12-34).  In rendering the administrative decision, the ALJ concluded that Plaintiff met the insured status requirements through September 30, 2024, and had not engaged in substantial gainful activity since May 3, 2019, the alleged onset date (Tr. 17).  After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: obesity, degenerative disc disease (DDD), polyneuropathy, depression, anxiety disorder, and seizure disorder (Tr. 17).  Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 19).  The ALJ then concluded that Plaintiff retained the RFC to perform sedentary work, except that Plaintiff could never climb ladders, ropes, or scaffolds; could frequently balance, kneel, crouch, or crawl; could frequently reach bilaterally; could occasionally be exposed to weather or humidity,

extreme cold, and extreme heat; could never be exposed to workplace hazards, such as moving mechanical parts and high, exposed places; was limited to simple and routine tasks but not at a production-rate pace; had the ability to make simple work-related decisions; and could tolerate occasional changes in the work setting (Tr. 21). In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 22).

Considering Plaintiff's noted impairments and the assessment of a vocational expert (VE), however, the ALJ determined that Plaintiff could not perform her past relevant work (Tr. 29). Given Plaintiff's background and RFC, the VE testified that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as a charge account clerk, an order clerk, and a document preparer (Tr. 30, 66). Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 31). Given the ALJ's finding, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-6, 159-62). Plaintiff then timely filed a complaint with this Court (Doc. 1). The case is now ripe for review under 42 U.S.C. § 405(g).

II.     *Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an "impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

To regularize the adjudicative process, the SSA promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4). If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and

work experience.  20 C.F.R. § 404.1520(a)(4)(v).  A claimant is entitled to benefits only if unable to perform other work.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 404.1520(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards.  *See* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted).  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision.  *Winschel*, 631 F.3d at 1178 (citations omitted); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal.  *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal

standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

III.    Discussion

Plaintiff argues that the ALJ erred by failing to properly consider the medical opinions of Monika Lippold, M.D., a consultative examiner, and Gary Weiss, M.D., Plaintiff's treating neurologist.   Plaintiff contends that the ALJ's assessment that Plaintiff could perform a reduced range of sedentary work conflicts with both of those medical opinions.   As a result, Plaintiff asserts that the RFC is not supported by substantial evidence.

Previously, in the Eleventh Circuit, an ALJ was required to afford the testimony of a treating physician substantial or considerable weight unless "good cause" was shown to the contrary. *Winschel.*, 631 F.3d at 1179; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (*per curiam*) (citation omitted).   Good cause existed where: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the physician's own medical records.   *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).   Claims filed on or after March 27, 2017 are governed by a new regulation applying a modified standard for the handling of opinions from treating physicians, however.   *See* 20 C.F.R. § 404.1520c; *see also Schink v. Comm'r of Soc Sec.*, 935 F.3d 1245, 1259 n.4 (11th Cir. 2019).   Of note, the new regulations remove the "controlling weight" requirement when considering the opinions of treating physicians for applications submitted on or

after March 27, 2017.  20 C.F.R. § 404.1520c(a); *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 895-98 (11th Cir. 2022); *Yanes v. Comm'r of Soc. Sec.*, No. 20-14233, 2021 WL 2982084, at *5 n.9 (11th Cir. July 15, 2021) (*per curiam*).[1]  Indeed, the Eleventh Circuit recently concluded that, since the new regulations fall within the scope of the Commissioner's authority and are not arbitrary and capricious, the new regulations abrogate the Eleventh Circuit's prior precedents applying the so-called treating-physician rule.  *Harner*, 38 F.4th at 896.  Accordingly, since Plaintiff submitted her application for benefits on September 26, 2019 (Tr. 163-69), the ALJ properly applied the new regulation.

Namely, under 20 C.F.R. § 404.1520c, an ALJ will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative finding, including from a claimant's medical source.  20 C.F.R. § 404.1520c(a); *see Tucker v. Saul*, Case No. 4:19-CV-00759-RDP, 2020 WL 3489427, at *6 (N.D. Ala. June 26, 2020).  Rather, in assessing a medical opinion, an ALJ considers a variety of factors, including but not limited to whether an opinion is well-supported, whether an opinion is consistent with the record, the treatment relationship between the medical source and the claimant, and the area of the medical source's specialization.  20 C.F.R. § 404.1520c(c)(1)-(4).  The primary factors an ALJ will consider when evaluating the persuasiveness of a medical opinion are supportability and consistency.  20 C.F.R. § 404.1520c(a) & (b)(2).  Specifically, the more a medical

---

[1]  Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

source presents objective medical evidence and supporting explanations to support the opinion, the more persuasive the medical opinion will be.  20 C.F.R. § 404.1520c(c)(1). Further, the more consistent the medical opinion is with the evidence from other medical sources and nonmedical sources, the more persuasive the medical opinion will be.  20 C.F.R. § 404.1520c(c)(2).  And, in assessing the supportability and consistency of a medical opinion, the regulations provide that the ALJ need only explain the consideration of these factors on a source-by-source basis – the regulations do not require the ALJ to explain the consideration of each opinion from the same source. *See* 20 C.F.R. § 404.1520c(b)(1).  Beyond supportability and consistency, an ALJ may also consider the medical source's specialization and the relationship the medical source maintains with the claimant, including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and whether the medical source examined the claimant, in addition to other factors.  20 C.F.R. § 404.1520c(c)(3)(i)-(v), (4), & (5).  While the ALJ must explain how he or she considered the supportability and consistency factors, the ALJ need not explain how he or she considered the other factors.[2]  20 C.F.R. § 404.1520c(b)(2).

In this instance, the ALJ considered the medical opinions of record, including the opinions from Dr. Lippold, Dr. Weiss, and the state agency medical consultants,

---

[2]  The exception is when the record contains differing but equally persuasive medical opinions or prior administrative medical findings about the same issue.  *See* 20 C.F.R. § 404.1520c(b)(3).

8

in determining that Plaintiff was not disabled (Tr. 21-29). Notwithstanding Plaintiff's arguments to the contrary, the ALJ properly considered the opinions of Dr. Lippold and Dr. Weiss in determining Plaintiff's RFC and provided substantial evidence in support of the decision.

A. Dr. Lippold

As the ALJ discussed, Plaintiff met with Dr. Lippold for a single consultative physical examination in November 2019 at the request of the Division of Disability Determinations (Tr. 23, 315-26). Plaintiff presented with complaints of back pain, joint pain, RLS, obesity, and mental health issues, including depression and anxiety, and stated that she could not work because of her medical problems (Tr. 315-16). As to Plaintiff's general appearance, Dr. Lippold noted that Plaintiff was frequently tearful during the examination, needed assistance to lie down and get back up, kept her right arm in flexion, showed some difficulty getting off the chair, was obese, and sitting hip flexion was 90 degrees bilaterally (Tr. 317-19). Upon examination, Dr. Lippold noted that Plaintiff's upper extremities showed tenderness and mild to moderate swelling at the right elbow and distal humerus with slight erythema and normal temperature with no other edema; no clubbing; intact and normal sensory perception; 4/5 muscle strength in the right upper extremity due to pain; 5/5 muscle strength in the left upper extremity; 4/5 grip strength in the right hand due to pain; 5/5 grip strength in the left hand; +1 deep tendon reflexes in the upper extremities bilaterally; normal radial pulse wrists; and pain to dorsiflex at the right wrist (Tr. 319). As to Plaintiff's lower extremities, Dr. Lippold indicated that Plaintiff showed no

edema; intact and normal sensory perception; 5/5 muscle strength in the left and right lower extremities; deep tendon reflexes were +2 at the patella and +1 at the Achilles; distal pulses were positive in the lower extremities as the posterior tibia and dorsalis; no joint deformities were noted; and her straight leg raise test showed lower back pain on the left and the right at 70 degrees (Tr. 319-20).

Dr. Lippold observed that Plaintiff's back was straight with no bony deformity, no paravertebral muscle spasms, and no point tenderness in the right and left SI joint but that the seated leg raise from the supine position showed lower back pain at 75 degrees (Tr. 320).  Plaintiff demonstrated a diminished range of motion in her back, hips, and knees (Tr. 323-25).  Regarding Plaintiff's neurological issues, Dr. Lippold noted only that Plaintiff's gross motor skills were decreased but not absent in her right upper extremity, and Plaintiff otherwise showed grossly intact cranial nerves; sensory perception to pain, light touch, temperature, and vibration were all intact and normal; gross motor skills in the left upper extremity were intact; and fine motor skills in both upper extremities were in intact (Tr. 320).  As to Plaintiff's gait and station, Dr. Lippold found that Plaintiff walked with a very slow but otherwise normal gait, did not require the use of an assistive device, could walk on her toes, and could squat about halfway but remained unable to walk on her heels, stating that she would experience pain in the left foot with pressure (Tr. 320).  With respect to Plaintiff's mental status, Dr. Lippold stated that Plaintiff cried at the time of the examination but was otherwise, alert; oriented to time, place, and person; showed no obvious memory loss; affect

appeared normal; no suicidal ideation was present at the time of examination; cognitive functioning was adequate; and stream of thought was adequate (Tr. 320).

Given her findings, Dr. Lippold diagnosed Plaintiff with depression and anxiety disorder, noting that Plaintiff received medication and medical care for each; right elbow pain, lumbago, and right and left heel pain, all of unclear etiology, for which Plaintiff did not receive medication but was under medical care; RLS, for which Plaintiff received medication and was under medical care; and obesity (Tr. 321). Based on her examination and assessment of Plaintiff's impairments, Dr. Lippold opined that Plaintiff could lift or carry 20 pounds occasionally on the left side only; could lift and carry 10 pounds frequently on the left side only; could stand and walk two to four hours cumulatively in an eight-hour day; could, if needed, sit four to six hours cumulatively in an eight-hour day; and could use upper body movements and coordinate activities with her hands (Tr. 321). Dr. Lippold did not indicate whether or to what extent Plaintiff could perform activities with her right arm (Tr. 321). In addition, Dr. Lippold noted that Plaintiff's husband drove Plaintiff to the examination and that Plaintiff was informed and acknowledged that she needed to actively pursue medical treatment plans for the medical impressions and problems outlined by Dr. Lippold (Tr. 321).

After discussing Dr. Lippold's findings and the other evidence of record, the ALJ found Dr. Lippold's opinion reasonably consistent with the record as a whole and therefore moderately persuasive (Tr. 23, 27). The ALJ noted that some discrepancies existed between Dr. Lippold's specific opinions and markings and the limitations

reflected in the RFC, but that such discrepancies were based on the ALJ's independent review, his consideration of Plaintiff's testimony, and all the other evidence in the aggregate, some of which was not available to Dr. Lippold at the time she offered her opinion (Tr. 27). As the Commissioner contends, the ALJ comprehensively discussed the other evidence of record that generally supported the limitations set forth by Dr. Lippold, including but not limited to treatment notes, including those from Dr. Weiss, indicating limited abnormalities, such as decreased range of motion, tenderness, and muscle spasms, or no abnormalities, such as normal gait, reflexes, pulses, sensation, and full strength in all extremities with only a mild reduction in the right upper extremity on occasion (Tr. 22-29, 285-86, 290-91, 305, 310-11, 347-48, 352-53, 366-67, 375-76, 381-82, 387-88).

Further, the RFC for a reduced range of sedentary work incorporates or is at least not inconsistent with the limitations set forth by Dr. Lippold, and, in fact, provides additional limitations beyond those set forth by Dr. Lippold. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools, with some sitting involved but with a certain amount of walking and standing often necessary in carrying out such jobs. 20 C.F.R. § 404.1567(a); Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *5 (1983). The SSA considers jobs sedentary if they require occasional walking and standing, and, since sedentary work, by its nature, is performed in a seated position, sedentary jobs entail no significant stooping. SSR 83-10, 1983 WL 31251, at *5; *see* 20 C.F.R. § 404.1567(a). As applied to jobs at the sedentary level of exertion,

"occasional" means that periods of standing or walking should generally total no more than about two hours of an eight-hour workday, and periods of sitting should generally total approximately six hours of an eight-hour workday.  SSR 83-10, 1983 WL 31251, at *5.  Additionally, "[m]ost unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."  SSR 83-10, 1983 WL 31251, at *5.

By limiting Plaintiff to a reduced range of sedentary work, the ALJ found Plaintiff's exertional limitations more restrictive than Dr. Lippold's limitation to lifting or carrying up to 20 pounds occasionally and incorporated the sitting, standing, and walking limitations.  Dr. Lippold did not address environmental, behavioral, or cognitive restrictions, but the ALJ included several restrictions to account for Plaintiff's limitations.  Regardless, as the Commissioner correctly notes, "an ALJ need not adopt every part of an opinion that the ALJ finds persuasive."  *Misla v. Comm'r of Soc. Sec.*, Case No: 6:20-cv-1076-DCI, 2021 WL 2417084, at *2 (M.D. Fla. June 14, 2021).  The decision shows that the ALJ discussed the evidence of record at length, including the evidence supporting and contrasting Dr. Lippold's opinion, and incorporated the limitations the ALJ found moderately persuasive.  In doing so, the ALJ provided an appropriate rationale for finding Dr. Lippold's opinion moderately persuasive and incorporating those limitations that the ALJ found supported by the record.  Accordingly, the ALJ properly considered Dr. Lippold's opinion, and substantial evidence supports the decision.

B.    *Dr. Weiss*

The ALJ also properly considered the opinion of Dr. Weiss (Tr. 27-28).  As the ALJ thoroughly discussed, Plaintiff began treating with Dr. Weiss, a neurologist, in February 2020, seeking an evaluation for treatment of her "complex neurological symptoms" (Tr. 23-26, 372-77).  At that time, Plaintiff complained of headache, neck pain, pain in the right upper arm only, mid-back pain, low back pain with numbness in her bilateral legs, dizziness, vertigo with nausea and vomiting, lightheadedness, fainting, difficulty concentrating, decreased concentrating ability, confusion, disorientation, memory lapses or loss, and convulsion spells (Tr. 372, 375).  Upon initial neurologic examination, Dr. Weiss noted, among other things, that Plaintiff's gait and station were normal, including tandem, toe, and heel walking; strength was normal and symmetric in all four extremities; reflexes were normal and symmetric in the upper and lower extremities; sensation was intact in the four extremities; cerebellar testing was within normal limits; and cerebrovascular exam was normal (Tr. 375-76).  Dr. Weiss noted spasms and tenderness in the thoracic spine; spasms, tenderness, and reduced movement in the lumbar spine; and spasms, tenderness, and reduced movement in the cervical spine (Tr. 376).  Dr. Weiss assessed Plaintiff as having weekly spells with aura, loss of consciousness, and postictal confusion, leading to a suspicion of seizures; lower back pain with radicular symptoms; lower thoracic spine pain; and neck pain (Tr. 376).  Dr. Weiss then set forth a treatment plan for Plaintiff, including a brain MRI, EEG, spinal MRI, medication, and no driving until loss-of-consciousness episodes could be treated (Tr. 376-77).

The following month, Dr. Weiss performed an MRI of Plaintiff's brain with and without paramagnetic contrast agent, which yielded normal results (Tr. 370-71). Plaintiff also underwent an EEG with Dr. Weiss at that time, which similarly yielded results within normal limits (Tr. 369). Plaintiff followed up with Dr. Weiss thereafter to review testing and evaluation of her treatment (Tr. 363-68). Plaintiff, whose husband accompanied her to the appointment, reported that she continued to experience seizures, headaches, dizziness, vertigo with nausea and vomiting, neck pain, mid-back pain, and low back pain and that she experienced a seizure four days prior to her appointment (Tr. 363). Notwithstanding several complaints by Plaintiff, Dr. Weiss observed that Plaintiff was alert and oriented; memory and other cortical functions were grossly intact; gait and station were normal, including tandem, toe, and heel walking; strength was normal and symmetric in all four extremities; reflexes were normal and symmetric in the upper and lower extremities; sensation was intact; cerebellar testing was within normal limits; and cerebrovascular exam was normal (Tr. 366-67). Dr. Weiss again noted spasms and tenderness in the thoracic spine; spasms, tenderness, and reduced movement in the lumbar spine; and spasms, tenderness, and reduced movement in the cervical spine (Tr. 367). Dr. Weiss indicated that Plaintiff should get a 72-hour EEG once she had insurance and obtain MRIs of her cervical, thoracic, and lumbosacral spine when feasible (Tr. 367). He also increased and prescribed medication, told her to follow up in one month, and indicated that Plaintiff should not drive until her loss-of-consciousness episodes could be treated and she was seizure-free for at least six months in accordance with Florida law (Tr. 367). Following

that appointment, Plaintiff underwent an MRI of the lumbosacral spine, which showed a moderate herniation with stenosis at L-4-5 (Tr. 362).

Subsequently, in April 2020, Plaintiff returned for a telehealth visit with Dr. Weiss, wherein she still complained of a lot of lumbar spine pain but stated that her mid-back pain had improved and was tolerable (Tr. 349-54). Plaintiff further indicated that she had experienced no seizures since the last office visit and that her thoracic spine pain was better but that her lumbosacral spine pain was not better, muscle relaxers did not help, and she had some ongoing neck and arm pain (Tr. 349). Despite Plaintiff's list of complaints, including headache, neck pain, worsening vision, difficulty swallowing, pain in the right upper arm, shoulder joint pain, mid-back pain, lower back pain, swelling in both feet, difficulty concentrating, decreased concentrating ability, memory lapses and loss, anxiety, depression, and insomnia, Dr. Weiss found that Plaintiff was alert and oriented; no evidence of a mood or thought disorder; memory and other cortical functions were grossly intact; gait and station were normal, including tandem, toe, and heel walking; cranial nerve testing was within normal limits; strength was normal and symmetric in all four extremities; reflexes were normal and symmetric in the upper and lower extremities; sensation was intact in the four extremities; cerebellar testing was within normal limits; and cerebrovascular exam was normal (Tr. 349, 352). As with the prior appointments, Dr. Weiss noted spasms and tenderness in the thoracic spine; spasms, tenderness, and reduced movement in the lumbar spine; and spasms, tenderness, and reduced movement in the cervical spine (Tr. 352-53). Dr. Weiss prescribed Plaintiff three different medications, provided

Plaintiff with information regarding herniation treatment options, recommended inversions due to the pandemic, and indicated that Plaintiff should not drive until her loss-of-consciousness episodes were properly treated and she remained seizure-free for six months in accordance with Florida law (Tr. 353-54).

In addition, Plaintiff underwent several diagnostic tests during April 2020. Initially, Dr. Weiss performed MRIs of Plaintiff's thoracic spine and cervical spine (Tr. 359-61). The MRI of the thoracic spine showed normal findings, while the MRI of the cervical spine showed abnormal results with the presence of a small herniation at C-5-6 (Tr. 359-61). Dr. Weiss performed an EEG where Plaintiff was awake and drowsy, which yielded results within normal limits (Tr. 355-56). Dr. Weiss also performed a 72-hour ambulatory EEG with video, which showed abnormal results with intermittent right temporal spikes, dys. grade II suggestive of partial complex seizures (Tr. 357-58).

The next month, Plaintiff had another telehealth follow-up appointment with Dr. Weiss (Tr. 344-48). She indicated that she experienced a nocturnal seizure the previous week and woke up with a severe headache, nausea, vomiting, and tinnitus (Tr. 344). She informed Dr. Weiss that her headaches had "calmed down quite a bit" and only occurred about once per week with pain as a five to six on a 10-point scale; she had not had any dizziness, vertigo, or lightheadedness since being on medication for her seizures; her short-term memory remained poor; she continued to experience intermittent neck pain on the right side with right arm pain; she experienced issues with grip strength and dropping items with her right arm and hand; she denied

numbness or tingling in her arms or hands; her pain level with range of motion ranged from a two to a six on a 10-point scale; her mid-back pain had improved since her last visit; she denied chest pain or shortness of breath; she continued to experience constant lower back pain that radiated into her bilateral hips, buttock, and legs; she experienced constant pain with numbness and tingling on the outer thighs; denied any weakness in her lower extremities; she felt like she was walking on golf balls with the left worse than the right; she had swelling in both feet; she rated her pain level as a five to 10 on a 10-point scale; she reported doing inversion three to four times per day; she indicated that hydrocodone did not help; she said her sleeping had been poor, getting only about three hours of uninterrupted sleep per night; she experienced excessive daytime fatigue; and indicated that medications kept both her anxiety and depression stable and that they had each improved since the seizures were under control (Tr. 344-45). Despite all of Plaintiff's complaints, Dr. Weiss set forth the same findings on examination that he had at all the prior appointments (Tr. 347-48). In his treatment plan, Dr. Weiss indicated that the seizures were down from two to three times per week to one nocturnal seizure in a month, he adjusted Plaintiff's medication regimen, he provided her with information regarding options for her herniations, he recommended continuing the inversions during the pandemic, he indicated that she should not drive again until the loss-of-consciousness episodes were treated and she remained free of such episodes for six months in accordance with Florida law, and he directed her to follow up again in one month (Tr. 348).

Then, in June 2020, Plaintiff had another telehealth follow-up appointment with Dr. Weiss (Tr. 384-88).  Dr. Weiss indicated that Plaintiff reported a seizure the previous week but then later noted that she offered a complaint of a nocturnal seizure the month prior to her last office visit with no other seizures since then (Tr. 384). Plaintiff indicated that her headaches had calmed down quite a bit to the point where she only experienced one headache per week; her headaches were a five to six on a 10-point scale and were associated with blurred vision, double vision, dizziness, nausea, vomiting, and light and sound sensitivity; she denied any tinnitus; she took Tylenol and laid down in a dark place to treat her headaches; she indicated that she had not had any dizziness, vertigo, or lightheadedness since being put on medication for her seizures; she indicated her short-term memory was still poor and that she was forgetful; she reported intermittent neck pain on the right side with pain in the right arm; she said she experienced issues with grip strength and dropping items with her right arm and hand; she denied any numbness or tingling in her arms or hands; she heard a fizzing noise with range of motion; she rated her pain level in the cervical spine as a three to four on a 10-point scale; she reported constant mid-back pain that radiated into the rib cages and down her lower back, with right greater than left; she rated her thoracic spine pain as a two to three on a 10-point scale; she reported chest pains and shortness of breath on occasion; she reported constant lower back pain that radiated into her bilateral hips, buttock, and legs; she reported constant pain with numbness and tingling on the outer thighs; she denied any weakness in her lower extremities; she reported feeling like there was a golf ball on the ball of her feet, with left greater than

right, which made it hard for her to walk at times; she reported her lumbosacral pain was an eight on a 10-point scale; she stated her appetite diminished; she stated her sleeping had been poor, with only about three hours of uninterrupted sleep per night; and she indicated that medication stabilized both her anxiety and depression and that the anxiety had improved since her seizures were controlled (Tr. 384-85).  Dr. Weiss then repeated the same physical findings upon neurologic examination as he had at the prior appointments and made the same notations regarding the reduction in seizures and the treatment plan of medication and no driving until she was seizure-free for six months (Tr. 387-88).

In August 2020, Plaintiff attended her final telehealth appointment with Dr. Weiss (Tr. 378-83).  She reported some numbness and tingling in the outer sides of her thighs and her knees after working from home and sitting for eight hours on the computer, but she stated that the issues started to improve after two weeks since she is no longer performing the work (Tr. 378).  She indicated that she may have experienced a possible seizure the other day, but that could have been related to missing her morning dose of Keppra (Tr. 378-79).  Plaintiff again indicated that her headaches calmed down quite a bit and that she experienced a headache about once per week, with the most recent one only noticed after experiencing a possible seizure; she rated her headache pain as a seven to nine on a 10-point scale and listed the same associated symptoms as previously noted; she indicated that she did not experience any dizziness or lightheadedness since being on the seizure medication but that her constant vertigo was not improving and her balance was worse; she continued to experience poor short-

term memory and forgetfulness; she reported continued intermittent neck pain on the right side with right arm pain and issues with grip strength and dropping items with her right arm and hand; she reported some numbness or tingling in her right arm or hand; she indicated her pain level in the cervical spine ranged from a four to an eight on a 10-point scale; she reported continued constant mid-back pain that radiated into the rib cages and down into her lower back, with the right worse than the left; she rated her thoracic spine pain from a four to an eight on a 10-point scale; she reported constant lower back pain that radiated into her bilateral hips, buttock, and legs; she reported constant pain with numbness and tingling on the outer thighs but denied any weakness in her lower extremities; she reported feeling like there was a golf ball on the ball of her feet, with the left worse than the right, which made it difficult for her to walk at times; she indicated that she stumbled and fell four times since her prior visit; she rated her lumbosacral spine pain from an eight to a 10+ on a 10-point scale; she indicated that her appetite diminished and she continued to lose weight; she indicated her sleep continued to be poor, with only about three hours of uninterrupted sleep per night; she experienced excessive daytime fatigue; and medications kept both her anxiety and depression stable, with her anxiety improving since getting the seizures under control (Tr. 379-80).  As with the prior appointments, Dr. Weiss repeated the same physical findings upon neurologic examination and set forth the same notations regarding the reduction in seizures and the treatment plan of medication and no driving until she was seizure-free for six months (Tr. 381-83).  He also indicated that she should follow up with his office in six weeks (Tr. 383).

Shortly thereafter, in September 2020, Dr. Weiss submitted a Physical Restrictions Evaluation in which he opined about Plaintiff's restrictions for the period beginning in June 2019 through the date of the evaluation (Tr. 394-96).  Dr. Weiss opined that Plaintiff could sit without interruption for 10 to 15 minutes and stand or walk for five to 10 minutes so as not to aggravate her injuries (Tr. 394).  He stated that, on average over the course of an eight-hour day, Plaintiff could sit for three hours, stand or walk for two hours, and lie down or recline for three hours (Tr. 394).  Dr. Weiss indicated that providing an option to change positions from sitting to standing would not enable her to work eight hours per day on a sustained basis; she should lie down, recline to rest, or elevate her legs above her heart during an eight-hour period every one to two hours for 15 to 30 minutes; her impairments were likely to produce good days and bad days; she would likely be absent from work each month three or more times due to her impairments, doctor's appointments, and other treatment; and she could lift or carry five pounds for no more than one-third of an eight-hour workday (Tr. 394-95).

Although Dr. Weiss noted that Plaintiff did not require an assistive device for standing or walking, he concluded that Plaintiff could only occasionally balance (one to three hours) and could never climb, stoop, crouch, kneel, or crawl (Tr. 395).  Dr. Weiss also indicated that Plaintiff experienced no limitations as to her vision, hearing, or speaking resulting from her impairments but that her impairments limited her ability to reach above her head, engage in fine finger manipulation, feel with her hands, and push or pull with her hands to only five percent each of an eight-hour day and

precluded her from repetitively using her hands or her feet to operate foot controls on a sustained basis throughout an eight-hour workday (Tr. 395-96). He opined that Plaintiff would be precluded from repetitively using her hands or feet on a sustained basis during an eight-hour period (Tr. 395-966). Additionally, Dr. Weiss noted that Plaintiff's impairments would result in environmental restrictions regarding unprotected heights, moving machinery, temperature extremes, and vibration (Tr. 396). Dr. Weiss stated that Plaintiff could not handle even low stress and that her medications would interfere with her ability to drive an automobile and remain mentally aware, for example, because the medications caused dizziness, drowsiness, and tiredness (Tr. 396). According to Dr. Weiss, Plaintiff's objective medical condition could be reasonably expected to produce the subjective symptoms of the nature and severity alleged by Plaintiff, and Dr. Weiss did not believe that Plaintiff showed any evidence of malingering or symptom exaggeration (Tr. 396). In support of his conclusions, Dr. Weiss pointed primarily to Plaintiff's low back pain with moderate herniation at L-4-5 and stenosis with radicular symptoms; lower thoracic spine pain; neck pain with small herniation at C-5-6; and partial complex seizure disorder with weekly spells with aura, loss of consciousness, and postictal contusion as the basis for such limitations (Tr. 394-96). According to Dr. Weiss, he based his opinion on his review of the records from ARNP Anabel Perez Pereda and Dr. Lippold and on his examination of Plaintiff and his relationship as a treating physician (Tr. 394).

In the decision, the ALJ considered Dr. Weiss's Physical Restrictions Evaluation at length (Tr. 27-28).  In doing so, the ALJ found Dr. Weiss's opinion not persuasive, highlighting the lack of consistency and supportability of Dr. Weiss's opinion with his own treatment notes and the other evidence of record, which complies with the requirements of the new regulations.  *See* 20 C.F.R. § 404.1520c(a), (b)(2), & (c).  As the ALJ discussed, Dr. Weiss's opinion was inconsistent with the other medical evidence of record.  For example, the ALJ noted that Plaintiff treated with ARNP Pereda in May and June 2019, after not seeking medical treatment since July 2018 (Tr. 22, 282-314).  Plaintiff presented during that time with almost entirely normal findings, including denying dizziness, headaches, or pain radiating down to her lower extremities (Tr. 282-91).  The ALJ pointed to the fact that Plaintiff did not return for treatment until February 2020, which, as the ALJ indicated, was not consistent with someone alleging disabling impairments to the point where she could not even hold up a coffee cup, as she asserted during the administrative hearing (Tr. 23).

The ALJ also highlighted the discrepancies between Dr. Weiss's treatment notes in February 2020 and ARNP Pereda's contemporaneous treatment notes, which in fact were generated on the same day (Tr. 27, 327-29, 372-77).  Mainly, while Plaintiff reported several musculoskeletal, neurological, and psychiatric issues to Dr. Weiss in February 2020, she reported no musculoskeletal symptoms; no headaches, dizziness, or other neurological symptoms; and no depression, anxiety, emotional problems or concerns, or other psychiatric symptoms to ARNP Pereda on the same

day (Tr. 22-27, 327-29, 372-77). Upon examination, ARNP Pereda found Plaintiff healthy-appearing, well-nourished, well-developed, and oriented to time, place, and person with a normal mood and affect (Tr. 329). The fact that one appointment pertained to neurology and the other pertained to gynecology is of no moment. Plaintiff reported completely different symptoms to two treating sources on the same day. Notably, in evaluating a claimant's symptoms, the ALJ considers both inconsistencies in the evidence and the extent to which any conflicts exist between the claimant's statements and the rest of the evidence, including the claimant's history, signs and laboratory findings, and statements by medical sources or other persons about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(c)(4). The ALJ therefore properly considered the inconsistencies in the record and the fact that Dr. Weiss's treatment notes conflicted with the other evidence of record.

Moreover, the ALJ correctly determined that Dr. Weiss's own treatment records did not support such extreme limitations. As the ALJ indicated, Dr. Weiss mainly based his opinion on Plaintiff's subjective complaints regarding her symptoms, especially because most of the appointments Plaintiff attended with Dr. Weiss occurred via telehealth appointments due to the pandemic (Tr. 27). Most of his treatment notes included a recitation of Plaintiff's subjective complaints with few abnormal findings upon examination. The ALJ also correctly stated that Dr. Weiss's physical findings at each visit were repetitive, including the telehealth visits, which included physical examination findings that could only be found during an in-person examination and that simply repeated from the previous in-person examinations (Tr.

27, 347-53, 366-67, 372, 375-76, 381-82, 387-88).[3]   In addition, the ALJ properly concluded that Dr. Weiss's treatment plan was not designed to cure or lessen any significant impairment but rather consisted of conservative treatment only prescribing medications and recommending inversion exercises (Tr. 27).   Dr. Weiss never suggested surgical interventions or any other treatment beyond medication adjustments to treat Plaintiff's impairments.

Further, Dr. Weiss repeatedly indicated that Plaintiff could not drive until her loss-of-consciousness episodes were treated and until she remained free of such episodes for six months, per Florida law (*see* Tr. 348, 354).   At the administrative hearing held on October 13, 2020, Plaintiff testified that she was able to get her driver's license back again, meaning she had been seizure-free for at least six months (Tr. 43).   The fact that she alleged a disability onset date of May 3, 2019, and then obtained her driving privileges prior to the October 13, 2020 hearing, indicates that her seizures became controlled within less than a year of her disability onset date and that her conservative treatment regimen worked, despite Plaintiff's subjective complaints to Dr. Weiss.[4]

The ALJ also appropriately found that the objective diagnostic testing did not reveal any disabling impairments (Tr. 27, 355-62, 369-71).   In support of her argument,

---

[3]  While I appreciate the challenges for individuals obtaining treatment during the pandemic, the fact that Dr. Weiss set forth findings that he could only observe in person weighs against finding his opinion persuasive.

[4]  Additionally, the fact that her seizures resolved within less than a year from her alleged onset date precludes a finding of a period of disability.

Plaintiff points to her diagnoses set forth in the MRIs and an abnormal EEG. "Diagnosis of a listed impairment is not alone sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings." *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) (citations omitted). "Disability is determined by the effect an impairment has on the claimant's ability to work, rather than the diagnosis of an impairment itself." *Davis v. Barnhart*, 153 F. App'x 569, 572 (11th Cir. 2005) (*per curiam*). Furthermore, the severity of a medically ascertained impairment is not measured in terms of deviation from purely medical standards of bodily perfection or normality but rather in terms of its effect upon ability to work. *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986). While diagnostic testing confirmed that Plaintiff suffered from mild to moderate herniations and from seizures, neither the diagnostic results nor the findings set forth in Dr. Weiss's treatment notes supported the severity of the limitations opined by Dr. Weiss stemming from those impairments. Accordingly, the ALJ appropriately found that Dr. Weiss's opinion was unpersuasive because it both lacked consistency with the other evidence of record and supportability in his own treatment notes.

Relatedly, Plaintiff takes issue with the ALJ's consideration of the opinions of state agency medical consultants (Tr. 29, 75-85, 87-99), arguing that the ALJ failed to provide adequate rationale for finding the opinions of non-examining state agency medical consultants more persuasive than Dr. Weiss's opinion.[5] As Plaintiff argues,

---

[5] The ALJ refers to only one state agency medical consultant, but the record indicates that two state agency medical consultants offered opinions (Tr. 29, 75-85, 87-99).

the regulations state that a medical source may have a better understanding of a claimant's impairments if he or she examines the claimant than if the medical source only reviews evidence in the claimant's folder.   20 C.F.R. § 404.1520c(c)(3)(v).   In finding the opinions of the state agency medical consultants moderately persuasive, the ALJ found that the opinions were not entirely consistent with or supported by the evidence because, though the state agency medical consultants concluded that Plaintiff experienced limitations, the evidence received at the hearing level showed that Plaintiff was more limited exertionally and non-exertionally than determined by the state agency medical consultants (Tr. 29).   Given that, the RFC included greater restrictions than those set forth by the state agency medical consultants.   As the regulations do not require any specific evidentiary weight to be afforded to a particular medical opinion, the ALJ did not need to provide any further rationale for finding the opinion of the state agency medical consultant more persuasive than Dr. Weiss.

Lastly, Plaintiff argues that the ALJ failed to consider the purpose and extent of the treating relationship between Plaintiff and Dr. Weiss or to consider the fact that Dr. Weiss specialized as a neurologist.   As noted above, the new regulations do not require the ALJ to explain how he or she considered the other factors outlined in 20 C.F.R. § 404.1520c(c) beyond supportability and consistency.   20 C.F.R. § 404.1520c(b)(2).   Included among those factors are the specialization of the medical source and the treating relationship the medical source had with the claimant, including the length of the treating relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the

examining relationship.   20 C.F.R. § 404.1520c(c)(3)-(4).   Despite the regulation explicitly stating that the ALJ may, but is not required to, explain how he or she considered those factors, Plaintiff argues that the ALJ should have nonetheless articulated his findings as to those factors.   Such argument lacks merit given the explicit permissive directive set forth in 20 C.F.R. § 404.1520c(b)(2), and, as a result, the ALJ did not err in that regard.

   *IV.*     *Conclusion*

   For the foregoing reasons, the ALJ applied the correct legal standards, and the ALJ's decision is supported by substantial evidence.   Accordingly, after consideration, it is hereby

   ORDERED:

   1.     The decision of the Commissioner is affirmed.

   2.     The Clerk is directed to enter final judgment in favor of the Commissioner and close the case.

   DONE AND ORDERED in Tampa, Florida, on this 19th day of September, 2022.

                                                     _Mark A. Pizzo_
                                                     MARK A. PIZZO
                                                     UNITED STATES MAGISTRATE JUDGE


cc:     Counsel of Record